Filed 12/8/21  P. v. Harris CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B306109 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA078478) |
| v. | |
| BERNARD JEROME HARRIS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Reversed and remanded with directions.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

Shortly after appellant Bernard Jerome Harris asked two men whether they belonged to a rival gang, which was believed to be responsible for an earlier assault on Harris's fellow gang member Richard Theus, Theus opened fire on the two men and a third who had joined them, killing one. During opening statement at Harris and Theus's trial, the prosecutor briefly mentioned that a former codefendant had pled guilty. The jury received instructions on a "direct" aiding and abetting theory and the natural and probable consequences doctrine, and convicted Harris of one count of murder and two counts of attempted murder. We affirmed in an unpublished opinion. (*People v. Theus* (May 18, 2011) 2011 Cal.App.Unpub. LEXIS 3728 (*Theus*).) In concluding that Harris was not prejudiced by the prosecutor's fleeting mention of his former codefendant's guilty plea, we stated that his conduct before the shooting, viewed in the context of his alleged gang motive, "independently established" his "participation and intent to aid the shooting." (*Id*. at *17-*19.) We did not mention that the jury had been instructed on the natural and probable consequences doctrine.

After the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), Harris filed a petition for resentencing under newly enacted Penal Code section 1170.95 (Section 1170.95), contending his convictions were invalid in the wake of SB 1437's elimination of murder liability under the natural and probable consequences doctrine. The trial court issued an order to show cause and held an evidentiary hearing, at which the parties relied on the record of conviction. During the hearing, the court indicated it would deny Harris's petition with respect to his attempted murder convictions, concluding Section 1170.95 did not apply to attempted murder. The prosecutor argued Harris was ineligible for relief from his murder conviction as well, because the evidence at trial showed he was guilty under a direct aiding and abetting theory, which was unaffected by SB 1437. Neither the prosecutor nor the court mentioned the analysis in our *Theus* opinion. After taking the matter under submission, the court issued an order denying Harris's petition in its entirety, stating that because we had "already deemed" him a direct aider and abettor in our *Theus* opinion, the prosecution had satisfied its burden to prove he could be convicted under a still-valid theory.

On appeal from the denial of his petition, Harris contends the trial court erred in: (1) relying solely on our *Theus* opinion to conclude the prosecution had met its burden to prove his ineligibility for relief beyond a reasonable doubt; and (2) concluding Section 1170.95 did not apply to attempted murder. The Attorney General disputes

3

both contentions, and additionally contends the invited error doctrine and the forfeiture rule bar Harris from challenging the court's exclusive reliance on our *Theus* opinion. After the appeal was fully briefed, the Governor signed into law Senate Bill No. 775 (2021-2022 Reg. Sess.) (SB 775), effective January 1, 2022. (See Cal. Const., art. IV, § 8, subd. (c)(2).) As amended by SB 775, Section 1170.95 expressly provides for relief from attempted murder convictions under the natural and probable consequences doctrine. (Stats. 2021, ch. 551, § 2.) We allowed the parties to file supplemental briefs, in which they agree we should remand for further proceedings under SB 775.

Considering only the law predating SB 775, we conclude the trial court erred in denying Harris's petition with respect to his murder conviction. Neither the invited error doctrine nor the forfeiture rule bars Harris's claim that the court erred in relying solely on our *Theus* opinion. Although the court's reliance on it was understandable, our opinion's analysis of prosecutorial error could not substitute for the trial court's independent factfinding regarding Harris's guilt under a still-valid theory. Accordingly, we reverse the order denying Harris's petition, and remand to the trial court with directions to hold a new evidentiary hearing. In light of SB 775's amendments concerning attempted murder, we additionally direct the court to hold the new evidentiary hearing after SB 775's effective date of January 1, 2022, and to reconsider whether Harris is eligible for relief from his attempted murder convictions.

4

# BACKGROUND

## A. Trial

### 1. Opening Statement

The People charged Harris and Theus with the murder of Marcus Peters and the willful, deliberate, and premeditated attempted murders of Derick Holman and Aaron Thomas.  (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *1.)  During the prosecutor's opening statement, he told the jury that Harris and Theus arrived at the scene of the charged offenses in a car driven and owned by Ryan Scott, who "was a third defendant in this case and has since pled out, so that's why he's not here."  (*Id*. at *13.)  The trial court denied Harris's requests for a mistrial and a special curative instruction in response to the prosecutor's mention of Scott's guilty plea.  (*Id*. at *13-*14.)  However, the court ordered the prosecutor not to mention Scott's plea again, and twice instructed the jury that what the attorneys said was not evidence, and that the jury was required to base its decision on facts determined by evidence.  (*Id*. at *14, *17.)

### 2. Evidence

The parties stipulated that Harris and Theus belonged to the Boulevard Crips gang, which the prosecution gang expert, Detective Chris Zamora, identified as a rival of the Sex Money Murder gang.  (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *10.)  In the afternoon of May 30, 2007, Theus and a companion were riding their bicycles in an area of Long Beach claimed by Sex Money

5

Murder.  (*Id.* at *3.)  Three unidentified men -- who were members of Sex Money Murder, in Detective Zamora's opinion -- assaulted Theus and his companion, and took their bicycles.  (*Id.* at *4, *10.)

That evening, Derick Holman and Marcus Peters were walking to a gas station in Long Beach.  (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *4.)  Holman noticed Theus walking near an alley, "'looking kind of suspicious.'"  (*Id.* at *4, *6.)  Holman and Peters continued to the gas station.  (*Id.* at *4.)  While they were in the station lot, a silver car -- which Holman identified as a car owned by Harris's former codefendant Ryan Scott -- drove up.  (*Id.* at *4, *6.)  Harris got out of the vehicle and approached.  (*Ibid.*)  Harris asked Holman and Peters if they were members of Sex Money Murder.  (*Ibid.*)  They replied they were not.[1]  (*Id.* at *4.)

A few minutes after their encounter with Harris, as they walked down the street, Holman and Peters were joined by Aaron Thomas.  (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *4.)  As the three men stood together on the sidewalk, a silver car approached.  (*Id.* at *4.)  Theus got out

---

[1]     Surveillance video from the gas station confirmed the presence of Holman, Peters, another individual (wearing a sweatshirt), and a silver car.  (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *4-*5.)  After Holman identified Harris in a photographic lineup, police officers executed a search warrant at Harris's apartment and seized a sweatshirt, which Holman testified looked like the one Harris had worn at the gas station.  (*Id.* at *5.)

of the vehicle and fired multiple rounds at them from a handgun. (*Id.* at *4, *6.) Peters was killed, and Holman was shot three times (Thomas escaped injury). (*Id.* at *4.)

Holman and Thomas denied that they were gang members, but Holman acknowledged he associated with members of Sex Money Murder. (*Theus, supra,* 2011 Cal.App.Unpub. LEXIS 3728, at *6-*7.) Detective Zamora testified that Peters also had been affiliated with Sex Money Murder. (*Id.* at *10.) Detective Zamora opined that the shooting was payback for the earlier assault on Theus. (*Id.* at *10.) Evidence was presented that during a recorded custodial interview, Theus's companion during the assault told detectives that Theus had admitted shooting some men as payback. (*Id.* at *7-*8.)

A deputy sheriff testified that five days before trial began, inside the lockup area of the courthouse, Harris asked the deputy to retrieve for him a folder he had left behind when entering the courtroom, but bailiffs informed the deputy the folder had been left by Theus. (*Theus, supra,* 2011 Cal.App.Unpub. LEXIS 3728, at *8-*9.) Inside the folder, the deputy found a greeting card addressed to Harris, containing a folded letter. (*Id.* at *9.) The author of the letter identified himself as "'2 Pistols,'" and wrote that "'G-Rich'" (Theus's nickname) was his "'lil fam Bam.'" (*Ibid.*) The letter went on to state in part: "'I don't like what [I']m hearing. I went to court the other day and I hear[]d a nigga say G-Rich is snitchin, so I got at cuzz and told cuzz G-Rich is my lil c[o]usin[.] Why is you speakin up on cuzz if you

7

have[n't] seen any paper work and cuzz said that's what he heard. But anyway let cuzz keep the paperwork so he can clear his name up. . . . But clear cuzz name up, let niggas know he ain't snitchin. But if cuzz is snitchin then you know he's a grown man, he got to deal with it. . . .'" (*Id.* at *9.)

### 3. Convictions

The jury convicted Harris and Theus of the first degree murder of Peters and the attempted murders of Holman and Thomas, which the jury found to be willful, premeditated, and deliberate. (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *1.) The jury found true, inter alia, an allegation that the crimes were committed for the benefit of a criminal street gang. (*Id.* at *1-*2.) Harris was sentenced to imprisonment for 105 years to life, plus 20 years. (*Id.* at *3.)

### B. Our Theus *Opinion*

On Harris's and Theus's direct appeals, we affirmed the judgment. (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *35-*36.) We rejected Harris's contention (joined by Theus) that the trial court prejudicially erred by denying Harris's requests for a mistrial and a special curative instruction in response to the prosecutor's reference in opening statement to the guilty plea of Ryan Scott (Harris's former codefendant and the owner of the car Holman said he saw at the gas station). (*Id.* at *3, *13.) Although we agreed that the prosecutor erred by mentioning Scott's plea, we

8

concluded, as described below, that Harris was not prejudiced. (*Id.* at *16-*17.)

As an initial matter, we rejected Harris's assertion that the error rendered his trial fundamentally unfair, noting that the prosecutor's single comment was "fleeting." (*Theus, supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *17.) We proceeded to conclude, for several reasons, that Harris had failed to show a reasonable probability that he would have obtained a more favorable outcome but for the prosecutor's comment. (*Ibid.*) "First, . . . the reference to Scott's plea occurred once and was extremely brief. Second, the jury was instructed twice [and was presumed to have understood] that it was to base its decisions on the facts, that the facts were to be determined by the evidence, and that statements made by the attorneys were not evidence. . . . Third, notwithstanding appellants' claim otherwise, the evidence of their guilt in the Peters killing was strong." (*Id.* at *17-*18.)

We elaborated on the strength of the evidence against Harris as follows: "Harris's involvement was established by Holman's identification, which was bolstered by the video from the gas station. Harris asserts that but for Scott's link as the driver of the vehicle, the jury could have concluded that Harris's presence was mere """happenstance.""" We are not persuaded. The gang motive was compelling. Appellants and the victims were members or affiliates of rival gangs. Theus was the victim of an attack in rival gang territory hours before the shooting and the Peters killing was in retaliation for that attack. The motive puts Harris's

approach of Peters and Holman in the gas station in context. He confronted them and asked their gang affiliation. Minutes later, Theus shot at Peters, Holman, and Thomas. *Harris's participation and intent to aid the shooting is independently established by his conduct.* Finally, Theus attempted to communicate with Harris in the courthouse shortly before trial. In the letter that was confiscated, the author tried to allay Harris's fear that his codefendant [Theus] was a snitch. If Harris were simply an innocent bystander who happened to be in Scott's vehicle on the night of the shooting, why would he be concerned that Theus was a snitch? The answer is clear. Theus could potentially provide damaging information linking Harris to the crime." (*Theus, supra,* 2011 Cal.App.Unpub. LEXIS 3728, at \*18-\*19, italics added.) We concluded, "After considering the totality of the circumstances, we are satisfied that appellants would not have received a more favorable verdict in the absence of the prosecutor's single comment made during opening statement." (*Id.* at \*19.)

### C. The Instant Petition
#### 1. Petition and Order to Show Cause

In January 2019, Harris filed a petition for relief under Section 1170.95, alleging he had been convicted under the natural and probable consequences doctrine, and could not

10

be convicted in the wake of SB 1437.[2]  Harris attached an instruction the jury had received on the natural and probable consequences doctrine, which read, in relevant part:  "One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of  any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.  [¶] In order to find the defendant guilty of the crimes of murder and attempted murder, as charged in counts 1, 2, and 3, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime or crimes of murder and attempted murder were committed; [¶] 2. That the defendant aided and abetted those crimes; [¶] 3. That a co-principal in that crime committed the crimes of murder and attempted murder; and [¶] 4. *The crimes of murder and attempted murder were a natural and probable consequence of the commission of the crime of murder.*"  (Italics added.)  Harris also attached an excerpt from the transcript of closing arguments, in which the prosecutor told

---

[2]    Before SB 1437 amended Penal Code sections 188 and 189 to eliminate murder liability under the natural and probable consequences doctrine, that doctrine "made 'a person who aids and abets a confederate in the commission of a criminal act . . . liable not only for that crime (the target crime), but also for any other offense (nontarget crime) [including murder] committed by the confederate as a "natural and probable consequence" of the crime originally aided and abetted.'" (*People v. Johns* (2020) 50 Cal.App.5th 46, 57-58.)

the jury (consistent with the first paragraph of the instruction) that an aider and abettor is guilty not only of the crimes originally aided and abetted, but also of any other crime committed by a principal as a natural and probable consequence thereof. At Harris's request, the trial court appointed counsel for him.

In a written opposition (citing no evidence other than the trial transcripts), the prosecution argued the jury necessarily had found Harris acted with the intent to kill, rendering him ineligible for relief from his murder and attempted murder convictions, because even the instruction on the natural and probable consequences doctrine had required such a finding (by identifying the target crimes as murder and attempted murder). In reply, Harris argued that because the instruction on the natural and probable consequences doctrine was confusing in asking the jury to determine whether murder and attempted murder were natural and probable consequences of murder, and because the trial prosecutor had argued the doctrine to the jury, the prosecution could not prove beyond a reasonable doubt that the jury had found intent to kill or otherwise convicted him under a still-valid theory. Harris additionally argued that Section 1170.95 applied to attempted murder.

In September 2019, the court issued an order for the prosecution to show cause why "the relief requested in the petition" should not be granted.

### *2. Evidentiary Hearing*

In February 2020, the court held an evidentiary hearing on Harris's eligibility for relief. Neither party sought to introduce evidence during the hearing.

Harris's counsel characterized the issue for the court's determination as whether the prosecution had proved beyond a reasonable doubt, "based upon the submission of the [trial] transcript and no other evidence," that a still-valid theory to support Harris's convictions "exist[ed] within that transcript." Counsel argued that because the jury had been instructed on the natural and probable consequences doctrine, the prosecution could not meet its burden "based upon the transcript" to prove beyond a reasonable doubt that Harris shared Theus's intent to kill. The court observed that Harris was not the shooter, and commented, "I couldn't tell from what I know of the facts, without reading all of the transcripts -- which I've not yet done -- what your client's role [was]. I was having a hard time figuring [that] out, other than maybe he was in the car [from which the shooter emerged]." Counsel argued there was no evidence that Harris was in the car when it arrived at the scene of the shooting, or that Harris shared Theus's intent to kill.

The prosecutor argued Harris was ineligible for relief because he could still be convicted of first degree murder as a direct aider and abettor.[3] The prosecutor argued Harris

---

[3] In the alternative, the prosecutor renewed his argument that Harris was ineligible for relief because the jury had been
*(Fn. is continued on the next page.)*

13

shared Theus's intent to kill the victims in retaliation for the earlier assault on Theus by members of Sex Money Murder, as evidenced by Harris's asking Holman and Peters whether they belonged to Sex Money Murder, before allegedly entering the same silver car from which Theus soon emerged to shoot the victims. The court observed that although there was evidence Harris arrived at the gas station in a car similar to the car from which Theus emerged, Harris had never been identified as "being in the car that the shooter got out of." The prosecutor confirmed this was correct. When asked to identify evidence that Harris was involved in the shooting, the prosecutor reiterated that Harris entered the "same" car used by the shooter, and the court responded, "Which [Harris's counsel] disputes, and I'll have to look and see what the evidence actually says." In response to further inquiries from the court, the prosecutor said he did not recall how much time passed between Holman's sightings of a silver car at the gas station and at the scene of the nearby shooting, but agreed that the time was longer than "a quick run around the block." The prosecutor further agreed that there was no direct evidence (either testimony or video) placing Harris in the car at the time of the shooting. Neither

---

required, even under its instruction on the natural and probable consequences doctrine, to find Harris acted with intent to kill. In response to inquiries from the court, the prosecutor agreed the instruction was "nonsensical" in asking the jury to determine whether murder (or attempted murder, a lesser included offense) was a natural and probable consequence of murder.

14

the prosecutor nor the court mentioned the analysis in our *Theus* opinion.

In rebuttal, Harris's counsel stated, "[T]he court knows the facts. The prosecutor accurately stated them to the court." He argued, "The court has directly and correctly evaluated the facts, those are the facts. There is no proof beyond a reasonable doubt of an intent to kill on Mr. Harris's part." When counsel began to discuss Harris's convictions for attempted murder, the court interjected that "the state of the law now is that SB 1437 does not apply to attempted murder." The court took the matter under submission.

### 3. *Ruling*

In April 2020, the court denied Harris's petition in a memorandum of decision. The court observed the prosecution had argued Harris was guilty as a direct aider and abettor, and had directed the court's attention to our *Theus* opinion, "which summarized the evidence presented at trial: that Petitioner and the victim were members of rival gangs; that Petitioner's co-defendant Theus was 'a victim of an attack in rival gang territory hours before the shooting;' and that the murder was retaliation for that attack." The court continued, "The Court of Appeal found the gang motive and Petitioner's conduct prior to the shooting established his 'participation and intent to aid the shooting.' (*People v. Theus*, *supra*, [2011 Cal.App.Unpub. LEXIS 3728,] at p. [18].) This indicates that Petitioner could have been found guilty of first-degree murder based on the viable legal theory

15

that he directly aided and abetted Theus in shooting and killing the victim.  [¶] Petitioner argues that because Petitioner was convicted on a natural and probable consequences theory of liability, the People must show 'on the evidence presented he could have been convicted under current law.' [Citation.]  As stated, ante, the Court of Appeal already deemed Petitioner as [*sic*] an aider and abettor.  Accordingly, that is a viable legal theory based on [Penal Code] section 188 of which Petitioner could have been convicted.  Therefore, because the People have met their burden, and [*sic*] the petition must be denied."

Harris timely appealed.

## DISCUSSION

With respect to his murder conviction, Harris contends the trial court erred in relying solely on our *Theus* opinion to conclude the prosecution met its burden to prove his ineligibility for relief under Section 1170.95 beyond a reasonable doubt.  With respect to his attempted murder convictions, Harris contends the court erred by concluding Section 1170.95 did not apply to attempted murder.  The Attorney General disputes both contentions, and additionally contends the invited error doctrine and the forfeiture rule bar Harris from challenging the court's exclusive reliance on our *Theus* opinion.

16

### A. Section 1170.95

Section 1170.95 permits a defendant who was convicted of murder under a natural and probable consequences theory, but who could not be convicted of murder following SB 1437's changes to the law, to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts. (Pen. Code, § 1170.95, subd. (a).)  Where, as here, the trial court finds the petitioner has made a prima facie showing of eligibility for relief, and the parties do not stipulate to relief after issuance of an order to show cause, the court must hold an evidentiary hearing on the petitioner's eligibility for relief. (*Id.*, § 1170.95, subds. (c)-(d).)  "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Id.*, § 1170.95, subd. (d)(3).)  In determining whether the prosecution has proved beyond a reasonable doubt the petitioner could be convicted under a still-valid theory, the court must independently find the petitioner guilty under such a theory.[4] (See *People v. Fortman* (2021)

---

[4]     SB 775 amends subdivision (d)(3) of Section 1170.95 to include the following language, which reinforces the trial court's duty to independently find the petitioner's guilt beyond a reasonable doubt: "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by [SB 1437] . . . .  A finding that
*(Fn. is continued on the next page.)*

64 Cal.App.5th 217, 225 (*Fortman*), review granted July 21, 2021, S269228 ["the People must convince the trial court, *as an independent trier of fact*, that the petitioner is guilty of murder on a still-valid theory beyond a reasonable doubt"]; accord, *People v. Clements* (2021) 60 Cal.App.5th 597, 615, review granted April 28, 2021, S267624; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 243-244, review granted March 10, 2021, S266652; *People v. Lopez* (2020) 56 Cal.App.5th 936, 952, review granted Feb. 10, 2021, S265974; *People v. Duchine* (2021) 60 Cal.App.5th 798, 815.)

"The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Pen. Code, § 1170.95, subd. (d)(3).) "[A]n appellate opinion [affirming the petitioner's conviction] is part of the record of conviction and may be relied on in deciding a section 1170.95 petition on the merits . . . ." (*People v. Clements*, *supra*, 60 Cal.App.5th at 603, rev. gr.; see also *People v. Lewis* (2021) 11 Cal.5th 952, 972.) "However, as [our Supreme Court] cautioned in [*People v.*]

---

there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Stats. 2021, ch. 551, § 2.) In light of this added language, the Attorney General states in his supplemental brief that the trial court applied an incorrect standard of proof. We note Harris did not contend the court applied an incorrect standard of proof, instead contending the court erred -- regardless of the standard of proof it applied -- by relying solely on our *Theus* opinion.

18

*Woodell* [(1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case-specific, and 'it is certainly correct that an appellate opinion might not supply all answers.'"[5] (*People v. Lewis*, *supra*, 11 Cal.5th at 972; see also *People v. Clements*, *supra*, 60 Cal.App.5th at 613, rev. gr.)

### B. Invited Error and Forfeiture

The Attorney General contends the invited error doctrine and the forfeiture rule bar Harris from challenging the trial court's exclusive reliance on our *Theus* opinion. The Attorney General principally relies on Harris's counsel's statements, in his rebuttal argument, that the prosecutor had accurately stated the facts, and the court had correctly evaluated them. "The invited error doctrine bars appellate review of any error which trial counsel deliberately and consciously, as a matter of trial tactics, induced the trial court to make." (*People v. Hall* (2018) 23 Cal.App.5th 576, 588, fn. 6.) Under the forfeiture rule, "[o]rdinarily, a criminal defendant who does not challenge an assertedly

_____

[5] SB 775 amends subdivision (d)(3) of Section 1170.95 to delete its reference to "the record of conviction," and to add, inter alia, the following language: "The court may also consider the procedural history of the case recited in any prior appellate opinion." (Stats. 2021, ch. 551, § 2.) In their supplemental briefs, the parties disagree regarding the meaning of this added language. Because we need not rely on this language, we express no opinion as to its meaning.

erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) But where the defendant receives no meaningful opportunity to challenge the ruling in the trial court, the forfeiture rule does not apply. (See *People v. Gonzalez* (2003) 31 Cal.4th 745, 752 [in absence of meaningful opportunity to object to trial court's discretionary sentencing choices, failure to object does not forfeit appellate challenge]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1000 [general rule of forfeiture applies ""where an objection *could have been*, but was not presented to the lower court by some appropriate method""" (italics added)].)

We conclude neither the invited error doctrine nor the forfeiture rule bars Harris's claim on appeal. During the hearing, Harris's counsel encouraged the court to rely on the trial transcripts. The prosecutor relied on the evidence at trial, and the court vigorously questioned him about it. Neither the prosecutor nor the court even mentioned the analysis in our *Theus* opinion. In this context, Harris's counsel's statements in rebuttal did not reflect a strategic decision to induce the court to rely solely on our opinion, as necessary to support application of the invited error doctrine. (See *People v. Hall*, *supra*, 23 Cal.App.5th at 588, fn. 6; *People v. Stitely* (2005) 35 Cal.4th 514, 553, fn. 19 [invited error doctrine did not bar defendant's challenge to trial court's withholding of jury instruction, where court's decision to withhold instruction "was not induced by defendant, but by the court's unwavering belief that the

20

instruction lacked evidentiary support," and there "seem[ed] to be no plausible tactical reason" why defendant would induce court to withhold instruction].) Moreover, Harris's counsel lacked a meaningful opportunity to object to the asserted error, as the prosecutor did not urge the court to rely solely on our opinion, and the court did not suggest it intended to do so. On the contrary, as the Attorney General acknowledges, "The record [of the hearing] supports the inference that the trial court read part of the trial transcripts prior to the evidentiary hearing and intended to read all of the transcripts before issuing a written ruling." In the absence of a meaningful opportunity to challenge the court's exclusive reliance on our opinion, Harris's counsel's failure to do so did not forfeit Harris's claim on appeal. (See *People v. Gonzalez*, *supra*, 31 Cal.4th at 752; *People v. Jenkins*, *supra*, 22 Cal.4th at 1000.)

### *C. Merits*

The trial court erred in relying solely on our *Theus* opinion in determining that the prosecution had proved beyond a reasonable doubt that Harris could be convicted as a direct aider and abettor, and was therefore ineligible for relief under Section 1170.95. We cannot fault the court for relying on the opinion's unequivocal statement, "Harris's participation and intent to aid the shooting is independently established by his conduct." (*Theus*, *supra*, 2011 Cal.App.Unpub. LEXIS 3728, at *18.) But understood in its context, this statement had little or no probative value in

21

proceedings under Section 1170.95.  (See *People v. Lewis*, *supra*, 11 Cal.5th at 972; see also *People v. Clements*, *supra*, 60 Cal.App.5th at 613, rev. gr.)  We made this statement in the course of reasoning that the evidence of Harris's guilt was sufficiently strong, in conjunction with two other factors on which we relied, to support our holding that Harris had not shown a reasonable probability he would have obtained a more favorable outcome had the trial prosecutor not made fleeting mention of his former codefendant's guilty plea. (*Theus*, *supra*, at *18.)  We were merely assessing the probability that the prosecutor's error affected the outcome of the trial -- not making a factual finding of Harris's guilt as a direct aider and abettor beyond a reasonable doubt.  (See *People v. Merritt* (2017) 2 Cal.5th 819, 830-832 [our Supreme Court was "not engaging in appellate factfinding" by concluding instructional error was harmless beyond a reasonable doubt, despite reasoning in part that prosecution evidence was "overwhelming"].)  Although the trial court was entitled to make such a finding, it was required to act as an independent factfinder in doing so.  (See, e.g., *Fortman*, *supra*, 64 Cal.App.5th at 225, rev.gr.)  The court improperly relied on our analysis of prosecutorial error as a substitute for an independent exercise of its factfinding functions.

The Attorney General does not argue the court was entitled to rely solely on our analysis.  Instead, he argues the court properly relied on our opinion only as an accurate summary of the trial evidence, which the court independently found established Harris's guilt as an aider

22

and abettor beyond a reasonable doubt.  The record does not support the Attorney General's reading.  Although the court had vigorously questioned the prosecutor about the trial evidence during the hearing, the court did not discuss the evidence in its memorandum of decision.  Nor did the court expressly or implicitly agree with our characterization of the evidence.  Instead, in stating that the prosecution had proved Harris could be convicted under a direct aiding and abetting theory because *we already* had deemed him a direct aider and abettor, the court merely substituted our characterization of the evidence for its own evaluation.  That was error.  (See, e.g., *Fortman*, *supra*, 64 Cal.App.5th at 225, rev.gr.)  Accordingly, we will remand for an independent exercise of the trial court's factfinding functions.

We need not decide whether the court erred in concluding that at the time it issued its ruling, Section 1170.95 did not apply to attempted murder.  By the time the court holds a new evidentiary hearing, SB 775's amendments to Section 1170.95 will be in effect.  (See Cal. Const., art. IV, § 8, subd. (c)(2).)  As amended, Section 1170.95 expressly applies to convictions for attempted murder under the natural and probable consequences doctrine.  (Stats. 2021, ch. 551, § 2 [amending subdivision (a) of Section 1170.95 to read, in relevant part, "A person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition with the court that sentenced the petitioner to have the

petitioner's . . . attempted murder . . . conviction vacated and to be resentenced on any remaining counts"].)

In his supplemental brief, the Attorney General suggests we should direct the trial court to consider whether Harris is entitled to an order to show cause with respect to his attempted murder convictions, asserting the court did not consider the issue. But the court implicitly did consider the issue, as it ordered the prosecution to show cause why the court should not grant "the relief requested in the petition" -- which included relief from the attempted murder convictions. Accordingly, we will direct the court to hold the new evidentiary hearing after SB 775's effective date of January 1, 2022, and to reconsider at that hearing whether Harris is eligible for relief from his attempted murder convictions.

## DISPOSITION

The order denying Harris's petition for resentencing under Penal Code section 1170.95 is reversed.  The matter is remanded to the trial court with directions to hold a new evidentiary hearing, after SB 775's effective date of January 1, 2022, on Harris's eligibility for relief from his murder and attempted murder convictions.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.